OPINION
Marques A. Franklin is appealing the judgment entry of the Montgomery County Court of Common Pleas convicting him of five counts of aggravated robbery with accompanying gun specifications and one count of having a weapon while under a disability, and sentencing him accordingly.
On September 7, 1999, a complaint was filed against Franklin in the Montgomery County Court of Common Pleas, Juvenile Division, asserting that he was delinquent by having committed four counts of aggravated robbery in violation of R.C. 2911.01(A)(1). The complaint was amended on September 8, 1999, to include firearm specifications and an additional count of having a weapon while under a disability, a violation of R.C.2923.13(A)(2). The State filed a motion to transfer Franklin's case to the General Division for criminal prosecution as an adult, and a probable cause hearing was held on October 12, 1999. On October 22, 1999, the juvenile court found probable cause and certified the case to the General Division.
On November 19, 1999, the Montgomery County Grand Jury indicted Franklin on five counts of aggravated robbery, each with a gun specification attached, and one count of having a weapon while under a disability. Franklin pled not guilty, and the trial on the aggravated robbery charges and the specifications was set for February 22, 2000.
At trial, it was determined that on September 4, 1999, Rhonda Shirk-Lipscomb, a City of Dayton police officer, and Jan McIntosh, a Neighborhood Assistance Officer, were working in their shop, Pickett Fences Beauty Salon. McIntosh was styling Theresa Dunkin's hair while Shirk-Lipscomb was cutting Benny Hall's hair. Elizabeth Freeders, an elderly customer with hearing and vision difficulties, was soaking her feet in a tub of water in the midst of receiving a pedicure. At approximately 1:15 p.m., Shirk-Lipscomb unlocked the door in anticipation of her daughter-in-law's and granddaughter's arrival.
At approximately 1:20 p.m., two African-American males entered the salon and asked to use the restroom. Shirk-Lipscomb directed them to the public restrooms at Chop Suey Paradise and Rooster's restaurant. In response, the first male, later identified as Franklin, pulled a gun from his pants pocket and stated "You know what this is, it's on." Franklin's partner positioned himself in the hallway near Shirk-Lipscomb's chair. Franklin immediately started screaming "Give me your mother-fuckin' money," as he instructed his partner to "get" money from the victims. Franklin then "rack[ed] the slide on the gun," releasing a round into the chamber and stated "I'm gonna kill all of you mother fuckers." Franklin's partner approached Shirk-Lipscomb who, feeling very threatened and wanting to cooperate, retrieved her purse and handed Franklin's partner $61. Franklin's partner then approached Hall, McIntosh and Dunkin. Franklin remained near the front door and yelled "I know you mother fuckers has {sic} more money than that." Again, he instructed his partner to "get" money from the victims.
When Franklin ordered his partner to retrieve Freeders' purse, McIntosh told the males to leave the older woman alone because she had no money. Franklin then yelled to his partner to "[g]et the fucking phone." McIntosh unplugged the telephone and gave it to Franklin's partner, who grabbed the phone with his hand underneath his shirt and gave it to Franklin. Franklin threw part of the telephone into a chair and another part into the street, and the two males ran across the street and into the alleyway behind Quinn's Auto Top and Upholstery. Shirk-Lipscomb grabbed her weapon and the keys to her Blazer and ran in pursuit of the males. McIntosh ran across the street to Quinn's to call the police. Eventually, Shirk-Lipscomb, who did not find the suspects, returned to the salon.
According to the victims, the duration of the robbery was approximately eight minutes. During that time, the victims were no more than ten feet away from Franklin and the store was well-lit. The witnesses described Franklin as having been approximately 5'6", with small features and a short-to-medium Afro hairstyle, approximately one to one-and-a-half inches in length. He wore a gray t-shirt covered by another longer shirt, jeans, tennis shoes, and a burgundy baseball cap with a gray lightening bolt on the front. Franklin's partner was slightly taller than Franklin. He wore a t-shirt and baggy shirt, jeans, tennis shoes, and had a silk "do-rag" on his head covering a "lot bigger `fro."
The owner of Quinn's Auto Top and Upholstery, Joseph Quinn, ate lunch at Chop Suey Paradise on September 4, 1999. At approximately 1 p.m., as he sat in a booth in the back of the restaurant, Quinn had observed a young African-American male wearing baggy clothes walk through the door, look around, then turn and walk back out the door. Several minutes later, after leaving the restaurant, Quinn observed the same male pace back and forth on the sidewalk with another African-American male. Quinn stated that one of the males had worn a baseball cap, and both males had been dressed in baggy clothing. As one male began walking towards him, a concerned Quinn had quickly crossed the street, entered his shop and locked the door. For the next several minutes, Quinn observed the males loitering in front of his shop, pacing back and forth. Eventually, Quinn proceeded to the basement of the shop to work. When he emerged from the basement, Quinn noticed two African-American males running through the alley. He was unable to determine if the males or their clothing matched the two males he had seen previously because they had been "flyin'." Quinn stated that these two males had appeared to be younger African-American males, and one had been wearing a baseball cap. Shortly thereafter, McIntosh and Shirk-Lipscomb appeared at his front door, yelling for him to let them inside. He unlocked the door and the women called the police.
On September 6, 1999, while Shirk-Lipscomb was on patrol in the area around the salon, she asked several citizens if they were familiar with any individuals who matched the suspects' descriptions. Shirk-Lipscomb explained that she had paid close attention to the first suspect who had stood at the door to the shop with the gun in an effort to identify him after the robbery. Shirk-Lipscomb believed the males had been from the area because they had "disappeared" so quickly after the robbery. Based upon her description of the suspect who had remained at the door with the gun, two individuals in the area provided her with Franklin's name, his address, and information about where he could have received the gun. Shirk-Lipscomb forwarded this information to Detective Mark Bilinski.
The next day, Detective Christin Beane and Officer Justin Hayes visited Franklin at the home of his father, Martin Thomas. The officers spoke with Thomas, who had been very cooperative and had given his consent for them to search his house. Although the officers found nothing of evidentiary value in the house, they brought Franklin to the police station to be fingerprinted and photographed.
Without disclosing that Franklin's photograph was in the photo spread, Det. Bilinski called Shirk-Lipscomb into the station to see if she could make an identification. Shirk-Lipscomb reviewed all six pictures, and without hesitation identified Franklin as the "one who had the gun." Shirk-Lipscomb noted that Franklin's hair was shorter in the photograph than it had been on the date of the robbery, but she stated that she had based her identification on Franklin's facial features. Det. Bilinski then separately showed the spread to Hall, Dunkin, Quinn and McIntosh.
Hall stated that he had had his head down while getting his hair cut during most of the incident and had not realized the males were not customers until several minutes into the robbery. When Det. Bilinski came to his house with a photo spread, he had been unable to identify anyone.
Dunkin testified that although the lighting in the shop had been bright enough to see someone's face, she had believed they were going to die and had concentrated more on the gun than on the suspects' faces. When asked to view the photo spread and identify any possible suspects, Dunkin had chosen Franklin's picture and another individual's picture.
Freeders testified that she is completely blind in her left eye, with only slight vision in her right eye. She recalled a loud disturbance coming from the direction of the entrance to the shop, but she had been unable to hear or see clearly. For these reasons, Det. Bilinski had not pursued an identification from Freeders.
Quinn chose Franklin out of the photo spread. He stated to Det. Bilinski that he had been "ninety percent sure, but [he was] not positive because of the distance between [him and the suspect]."
McIntosh quickly and without hesitation identified Franklin as the suspect with the gun. She noted that the photograph depicted Franklin with shorter hair than he had had during the robbery, however she stated that she had based her identification on Franklin's facial features, and she had no doubt that Franklin was the suspect who had pointed the gun at them during the robbery.
Franklin testified on his own behalf. He denied committing the robbery and stated that on September 4, 1999, he had been at the home of his friend, Robert Jordan, from approximately 11 a.m. until 5 p.m. with his older brother Marvis and his five-year-old niece, Tish. He and Tish left Jordan's house around 1 p.m. for about thirty to forty minutes to go home for lunch and to awaken his father. During the time he was at his father's house, he received a telephone message for his father from Martha Davis. Davis, who also testified, believed she had spoken with Franklin, but was not certain that the person on the telephone had not been Franklin's older brother Marvis.
At the close of trial, the jury found Franklin guilty of all five counts of aggravated robbery with the accompanying gun specifications. Franklin was sentenced to four-year terms of incarceration on each count of aggravated robbery, to be served concurrently, and three-year terms of incarceration on each firearm specification, to be served concurrently and prior to all other sentences. Additionally, we note that Franklin was found guilty by the trial court on the charge of having a weapon while under a disability. He was sentenced to a twelve-month term of incarceration on this charge, to be served concurrently with the other sentences.
Franklin now appeals his convictions and sentences on the aggravated robbery charges and the accompanying firearm specifications. He asserts three assignments of error.
 I. The accused's right to effective assistance of counsel is violated when appointed counsel's performance is deficient and the accused is thereby prejudiced. U.S. Const. Amends VI, XIV.
Franklin contends that his trial counsel was ineffective for failing to file a motion to suppress, failing to adequately cross-examine witnesses, and failing to present the testimony of Thomas, a crucial alibi witness.
To show ineffective assistance of counsel, a defendant must prove that his trial counsel's representation fell below an objective standard of reasonableness and that the defendant was prejudiced by the deficient performance. Strickland v. Washington (1984), 466 U.S. 668, 687-688; State v. Bradley (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus. In order to show prejudice, the defendant must prove that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. Strickland, supra, at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.
Franklin first argues that his trial counsel was ineffective for failing to file a motion to suppress Shirk-Lipscomb's and McIntosh's photo identifications, the "only" evidence linking Franklin to the crime. According to Franklin, the motion would have prevailed because the suspect's baseball cap had covered his forehead and the suspect had been several feet away from the victims during the incident, thus the witnesses had had no opportunity to clearly view the suspect's face. Franklin also argues that the stress and confusion of being robbed at gunpoint led to the misidentification of Franklin as the suspect. Finally, he contends that the identifications were the result of a "tainted investigation," because the witnesses had had the opportunity to discuss the robbery before reviewing the photo line-up, and because Shirk-Lipscomb had investigated the matter and had provided information to Det. Bilinski. Based upon these claims, Franklin argued that his trial counsel had an ethical duty to challenge the identifications.
Trial counsel's failure to file a suppression motion does not per se constitute ineffective assistance of counsel. State v. Lester (1998),126 Ohio App.3d 1, 6. "The Sixth Amendment right to effective assistance of counsel does not require defense counsel to file a motion to suppress evidence where none of the defendant's constitutional rights were violated." (Citations omitted.) State v. Frazier (Nov. 25, 1996), Butler App. No. CA96-02-023, unreported. The party asserting an ineffective assistance of counsel claim must demonstrate that the failure to file the suppression motion caused him prejudice. Id. However, failure to file a suppression motion may constitute ineffective assistance of counsel where there is a solid possibility that the trial court would have suppressed the evidence. State v. Garrett (1991), 76 Ohio App.3d 57.
In this case, Shirk-Lipscomb and McIntosh testified that they had purposely studied the suspect's face during the eight minutes of the robbery in an effort to later identify him. They explained that his face had not been blocked by the baseball cap on his forehead, and that the suspect had been in relatively close proximity, thus they had easily viewed his facial features. Moreover, they based their identifications of Franklin upon their recollection of his facial features, and they were both certain that it had been Franklin who had held them at gunpoint. Consequently, we find nothing to suggest that Shirk-Lipscomb and McIntosh did not have an opportunity to clearly view the suspect's face and make accurate identifications based upon their experience.
Regarding Franklin's allegations that the investigation was "improper," we find evidence in the record that Shirk-Lipscomb and McIntosh had attempted to view mug shots the day after the incident in an effort to identify the suspect, but they had been unable to access the file from the computer at the police station. While on duty the following day, Shirk-Lipscomb described the suspect to some citizens in the area who had suggested that Franklin might be the suspect. Shirk-Lipscomb, who did not know Franklin, provided Franklin's name and address to Det. Bilinski, but had done nothing further to investigate the robbery. We do not believe this amounts to an "improper investigation," nor evidence that Shirk-Lipscomb would have known that Franklin was in custody at the time she viewed the photo spread.
Based upon the above discussion, we do not find that Franklin's trial counsel would have prevailed on the motion to suppress, or that Franklin was prejudiced by the failure to file them, and thus we overrule his first ineffective assistance of counsel claim.
In the second portion of this assignment of error, Franklin argues that trial counsel was ineffective because he had failed to cross-examine Shirk-Lipscomb and McIntosh regarding their "prior inconsistent statements" surrounding their identifications of Franklin. In particular, Franklin points to slight inconsistencies between McIntosh's and Shirk- Lipscomb's testimonies during the probable cause hearing and the trial regarding which suspect had taken Freeders' purse.
In applying the appropriate standard to this case, we conclude that Franklin failed to demonstrate that he had received ineffective assistance of counsel. Even if we assume, arguendo, that his counsel's representation fell below objective standards of reasonable representation, we cannot find that Franklin's case was prejudiced. As the State points out, trial counsel adequately challenged the witnesses' recollection of events, their interest in identifying Franklin as the suspect, and the reliability of the photo spread identifications. As such, Franklin's second claim of ineffective assistance of counsel is meritless.
In his final claim of ineffective assistance of counsel, Franklin argues that his trial counsel's failure to present Thomas' testimony, a "crucial alibi witness," constituted ineffective assistance of counsel.
Preliminarily, we note that the United States Supreme Court has recognized that "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, supra, at 690. Therefore, Franklin must overcome a strong presumption that, under the circumstances, the challenged action is considered sound trial strategy, rather than conduct which constitutes ineffective assistance of counsel. State v. Sallie (1978), 81 Ohio St.3d 673, 674.
In viewing the record from the probable cause hearing, we find that Thomas' testimony was less than helpful in providing an adequate alibi for Franklin. Thomas testified at the probable cause hearing that he had been awakened at approximately 1 p.m. on September 4, 1999 by Franklin, and that Franklin, Marvis and Tish had remained in Thomas' home until approximately 2 p.m. However, Det. Bilinski stated that on September 7, 1999 he had specifically asked Thomas about Franklin's whereabouts during the hours in question. At that time, Thomas failed to mention that Franklin had been in his home between the hours of 1 and 2 p.m. Instead, Thomas stated to Det. Bilinski that he had been asleep until approximately 3 p.m., and that when he had awakened, Franklin and Marvis had been in his home. This explanation provided by Thomas to Det. Bilinski directly contradicted what Minnie Jordan, Martha Davis and Franklin had recalled at trial, which was that Franklin had been at Jordan's home between the hours of 11 a.m. and 4 p.m., with the exception of Franklin's quick trip to his father's home between 1 and 2 p.m.
In light of this testimony, we find that trial counsel did not fall below the standard of reasonable representation, and his decision not to call Thomas was sound trial strategy. Accordingly, we find his third claim to be meritless.
Franklin's first assignment of error is overruled.
 II. The State failed to establish probable cause to initiate the transfer of the accused from the Juvenile Division of the court to the Montgomery County Court of Common Pleas.
Franklin appeals the juvenile court's decision transferring him to the General Division, asserting that there was insufficient evidence for the court to conclude that probable cause had existed, and therefore his conviction should be reversed. Specifically, Franklin argues that the only evidence linking him to the crimes was "tainted" and inherently unreliable because Shirk-Lipscomb had personally investigated the matter. We disagree and find strong evidence in the record to provide probable cause that Franklin had committed the crimes.
Franklin was bound over to the General Division pursuant to R.C.2151.26(B)(4)(b), which states:
 (B) After a complaint has been filed alleging that a child is a delinquent child for committing an act that would be an offense if committed by an adult, the court at a hearing shall transfer the case for criminal prosecution to the appropriate court having jurisdiction of the offense if the child was fourteen years of age or older at the time of the act charged, if there is probable cause to believe that the child committed the act charged, and if one or more of the following applies to the child or the act charged:
* * *
 (4) The act charged is a category two offense, other than a violation of section 2905.01 of the Revised Code, the child was sixteen years of age or older at the time of the commission of the act charged, and either or both of the following apply to the child:
* * *
 (b) The child is alleged to have had a firearm on or about the child's person or under the child's control while committing the act charged and to have displayed the firearm, brandished the firearm, indicated possession of the firearm, or used the firearm to facilitate the commission of the act charged.
Franklin's sole focus in this assignment of error is that the State failed to establish the requisite level of probable cause that he had committed the crimes. At a probable cause hearing, the state need not establish every element beyond a reasonable doubt, but must simply present evidence of "probable cause to believe" that the defendant committed the acts. R.C. 2151.26(B); Juv.R. 30(A) and (B). Furthermore, the standard of probable cause is a fair probability, not a prima facie showing, of criminal activity. State v. George (1989), 45 Ohio St.3d 325. When reviewing a claim of the absence of probable cause, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. Cf. State v. Anderson (1995), 100 Ohio App.3d 688,691.
At the probable cause hearing, McIntosh and Shirk-Lipscomb testified that they had been robbed at gunpoint on September 4, 1999 in their salon. During the robbery, which lasted approximately eight minutes, they were able to clearly see Franklin's face. Shirk-Lipscomb and McIntosh paid particularly close attention to the suspect's face in an effort to identify him in the future. As we discussed in our response to Franklin's first assignment of error, we do not believe that the identifications were improper, and we again disregard Franklin's argument that they were "tainted" because Shirk-Lipscomb was a police officer who had assisted Det. Bilinski in finding Franklin's name as a possible suspect.
Instead, we find that the identifications were proper and valid. Both McIntosh and Shirk-Lipscomb stated that they had been able to choose Franklin's photo out of the photo spread without hesitation, and that they were certain that it had been Franklin who had held them at gunpoint and robbed them. This alone is sufficient to establish probable cause. See, generally, State v. DeLeon (May 19, 2000), Montgomery App. No. 17574, unreported.
Based upon the above discussion, we find that the juvenile court applied the facts to the appropriate legal standard, and that there had been probable cause to believe that Franklin had committed the crimes and at the time had possessed, displayed, and brandished the firearm to facilitate the commission of the crimes.
Franklin's second assignment of error is overruled.
 III. Appellant's conviction was against the manifest weight of the evidence.
Franklin argues that the unreliability of the eyewitness testimony, the presentation of his alibi defense, and the absence of physical evidence linking him to the robbery compels the conclusion that the jury's verdict was against the manifest weight of the evidence.
We note that in a manifest weight of the evidence argument, an appellate court:
 [R]eview[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. While Thompkins explicitly permits this court to consider credibility when confronted with an argument that the verdict is against the manifest weight of the evidence, such consideration is not unbounded. We have explained the limited role of an appellate court in reviewing issues of credibility in weight of the evidence challenges as follows:
 Because the factfinder, be it the jury or * * * the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in Thompkins, supra, we conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence — in short, how persuasive it is.
State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported. Mindful of these principles, we turn to the merits of this assignment of error.
After reviewing the record in this case, we do not find it patently apparent that the jury lost its way. Franklin was found guilty of five counts of aggravated robbery under R.C. 2911.01(A), which provides that:
 No person, in attempting or committing a theft offense * * * shall * * *:
 (A) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]
The witnesses testified at trial that two young African-American males entered the Pickett Fences Beauty Salon on September 4, 1999 at approximately 1:20 p.m. and robbed them at gunpoint. Three days later, Shirk-Lipscomb and McIntosh quickly and without hesitation identified Franklin as the suspect who had held them at gunpoint during the incident. Additionally, despite not being completely certain, we find that Dunkin's and Quinn's identifications of Franklin from the photo spread serve to corroborate Shirk-Lipscomb's and McIntosh's identifications.
In his first manifest weight of the evidence claim, Franklin argues that Shirk- Lipscomb's testimony was incredible because her "investigation" into the robberies was improper and tainted her identification of Franklin. Furthermore, her subsequent arrest of Robert Jordan, Minnie Jordan's grandson, indicated a "strong inference" that the officers had been familiar with Franklin and had formed an opinion of his involvement in the robbery. We do not agree. Shirk-Lipscomb, believing the suspect lived near the salon, had provided the suspect's description to several citizens in the neighborhood. Upon obtaining Franklin's name from two individuals, Shirk-Lipscomb shared the information with Det. Bilinski, but did nothing further to investigate the robbery. She stated that she had not been familiar with Franklin, and his name had not triggered a mental picture. The jury heard all of the circumstances surrounding Shirk-Lipscomb's identification, determined that Shirk-Lipscomb was credible, and convicted Franklin on the aggravated robbery charges. Moreover, Franklin cross-examined Shirk-Lipscomb on her motives and her actions following the incident, and did so in the presence of the jury. We will not interfere with the jury's determination of credibility, for we are unable to find the jury's choice to find Shirk-Lipscomb credible to be "so incredible that it defies belief." Fairborn v. Boles (May 15, 1998), Greene App. No. 97 CA 110, unreported. Accordingly, we overrule his first claim.
Franklin's next manifest weight of the evidence claim focuses on the "failure" of trial counsel to call Thomas as an alibi witness. It is unclear from his brief how this claim differs from his ineffective assistance of counsel claim and how it corresponds with his manifest weight of the evidence argument. From what we can discern, Franklin reiterates his ineffective assistance of counsel argument regarding trial counsel's failure to present Thomas' testimony, but then implies that the verdict was against the manifest weight of the evidence in light of the other alibi testimony. We must again refer Franklin to our decision in his first assignment of error, and we now disagree with the second part of his claim. Franklin testified that he had been at his father's home on September 4, 1999 between 1 and 2 p.m., to awaken his father and to prepare lunch for his niece. Minnie Jordan testified that Franklin had spent all day at her house with the exception of the hour between 1 and 2 p.m. Martha Davis stated that she had called Thomas' home at approximately 1:20 p.m. and had left a message with someone who identified himself as Marques Franklin. However, it was within the jury's province to determine whether or not to believe Franklin's alibi evidence, and we cannot say that the jury lost its way by not crediting these witnesses' testimonies. For these reasons, we find this claim to be meritless.
Finally, Franklin argues that the verdicts were against the manifest weight of the evidence because there had been no physical evidence linking him to the incident, and instead the only evidence linking him to the crime was Shirk-Lipscomb and McIntosh's identifications. Again, we defer to the jury's finding that the testimony of Shirk-Lipscomb and McIntosh, who positively identified Franklin as the robber, was highly credible and indicative of Franklin's guilt. We find the lack of physical evidence in this case to not be dispositive of guilt or innocence. Therefore, we cannot say that the conviction is against the manifest weight of the evidence.
Franklin's final assignment of error is overruled.
 ___________________ YOUNG, J.
WOLFF, P.J. and FAIN, J., concur.